UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                               Chapter 7

Ann Arbor Consultation Services, Inc.,               Case No. 19-51340

      Debtor.                                       Hon. Phillip J. Shefferly

_____/

Douglas S. Ellmann, Chapter 7 Trustee                Adversary Proceeding
for the bankruptcy estate of Ann Arbor               No. 19-4511-PJS
Consultation Services, Inc.,

      Plaintiff,

v.

Terry Dunivin,

      Defendant.

_____/

### OPINION GRANTING DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

### Introduction

Before it filed a Chapter 7 petition, the debtor operated a behavioral health clinic

at property that it leased from one of its two shareholders. The lease contained an

option for the debtor to purchase the property. The Chapter 7 trustee filed a complaint

against the shareholder who owned the property seeking a declaratory judgment that

the trustee could exercise the option, and for other relief relating to the option. The property owner filed a motion for summary judgment arguing that the trustee cannot exercise the option because the option is a part of the lease, and the lease was rejected by the trustee. The Court agrees with the property owner and will therefore grant the motion.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) over which the Court has jurisdiction under 28 U.S.C. § 1334(a).

## Facts

The following facts are taken from the case file and are not in dispute.

Ann Arbor Consultation Services, Inc. ("Debtor") is a Michigan corporation, which operated a behavioral health clinic that treated patients with mental health and substance abuse problems. The Debtor operated at more than one location, but its main location was at 5331 Plymouth Road, Superior Township, Michigan ("Property"). Laura Senk ("Senk") was the president of the Debtor and a 50% shareholder. Terry Dunivin ("Dunivin") was the vice-president and a 50% shareholder. Dunivin was also the owner of the Property.

In October, 2015, the Debtor, Senk and Dunivin entered into two agreements. One of them, dated October 1, 2015, was a shareholder agreement ("Shareholder Agreement") between Senk and Dunivin to govern the Debtor's operations. Another

one, dated October 16, 2015, was a lease ("Lease") between the Debtor and Dunivin for the Property. The Lease was for a five-year term, with two successive renewal options, each for five years. In addition, if Dunivin were to die while the Lease was in effect, the Lease provided the Debtor with a one-year option to purchase the Property for "fair market value."

In April, 2016, the Debtor, Senk, and Dunivin made some amendments to their agreements.

On April 22, 2016, Senk and Dunivin entered into a First Amendment to Restated Shareholder Agreement ("Shareholder Amendment"). Among other things, the Shareholder Amendment added a new section to the Shareholder Agreement titled "Additional Dunivin Terms of Conduct" that required Dunivin to refrain from specified conduct detrimental to the Debtor's business, and also imposed specified affirmative responsibilities on Dunivin.

On the same day, the Debtor and Dunivin entered into a First Amendment to Lease Agreement ("Lease Amendment"). The Lease Amendment replaced the option to purchase in the Lease with a new section 22 titled "Purchase Options." Under this new section in the Lease Amendment, the Debtor still had an option to purchase the Property upon Dunivin's death (22.1), but now the Debtor had three more options too, one upon Dunivin's "Permanent Disability" (22.2), one upon Dunivin's "Voluntary Termination of Employment" (22.3), and one upon Dunivin's "Other Termination of

- 3 -

Employment" (22.4). Each option was for one year after the specified event. One of the three new options was very different than all the other options in an important respect — the purchase price that would have to be paid for the Property. Section 22.5(a) provided that the purchase price for the Property under any of the first three options, in section 22.1, 22.2, and 22.3, was "fair market value." However, section 22.5(c) provided that the purchase price for the Property under the fourth option in section 22.4 — "Other Termination of Employment" — would only be 50% of "fair market value."

On the same day that they entered the Lease Amendment, the Debtor and Dunivin entered into a Memorandum of Lease ("Memorandum") that summarized some of the terms of the Lease Amendment, and described itself as "merely a Memorandum" that was "subject to all of the terms, conditions and provisions" of the Lease Amendment. The Memorandum was recorded with the Washtenaw County Register of Deeds on December 20, 2016.

On February 15, 2019, Senk wrote a letter ("Termination Letter") to Dunivin advising him that the Debtor was immediately terminating Dunivin's employment with the Debtor because he had "knowingly, willfully and repeatedly violated [his] terms of conduct outlined in the Shareholder Amendment and [was] a detriment to the [Debtor] and its staff and patients." The Termination Letter also stated that Dunivin's termination "gives rise" to the Debtor's option ("Option") to purchase the Property

- 4 -

under section 22.4 and 22.5(c) of the Lease Amendment, and that the Debtor was "currently exploring whether it will exercise this option."

The Debtor defaulted under the Lease by failing to pay rent beginning in June, 2019, and continuing thereafter.

On August 6, 2019, with its business now shut down, the Debtor filed a voluntary petition under Chapter 7. The Debtor's schedule A/B listed an interest in real property consisting of the "right (option) to purchase" the Property "at 50% of FMV per lease agreement" and further stated "net equity estimated at $150,000.00 — 240,000.00."

Douglas Ellmann ("Trustee") was appointed as the Chapter 7 trustee in the Debtor's case.

On November 14, 2019, the Trustee filed a motion ("Motion to Extend") under § 365(d)(4)(B)(i) of the Bankruptcy Code to extend until March 3, 2020 the time to assume or reject the Lease, as amended by the Lease Amendment.[1] The Motion to Extend explained that the Trustee, as the representative of the bankruptcy estate, has the right under the Option to purchase the Property for 50% of its fair market value and that the Trustee had hired a broker to market the Property for sale to obtain the funds needed to exercise the Option. The Trustee stated in the Motion to Extend that he did

---

[1] For convenience, the Lease and Lease Amendment will hereafter be collectively referred to as "Amended Lease." The Court will continue to refer to the Lease and Lease Amendment separately in those instances where the context so requires.

not believe that it was necessary for him to assume the Amended Lease in order to exercise the Option, but that he wanted the additional time to assume or reject just in case the Court saw it differently. The Trustee further explained in the Motion to Extend that unless he needed to assume the Amended Lease to exercise the Option, he did not intend to assume the Amended Lease because he had no reason to occupy the Property and the bankruptcy estate did not have any funds to pay rent for the Property. Dunivin filed an objection to the Motion to Extend. The Court scheduled a hearing for December 20, 2019.

At the hearing, the Trustee advised the Court that he intended to exercise the Option and that he believed that he had the right to do so, regardless of whether the Motion to Extend was granted, and regardless of whether the Amended Lease was assumed, because the Option is severable from the Amended Lease. Further, the Trustee advised the Court that he had just recently filed this adversary proceeding, on November 22, 2019, to obtain an adjudication that the Option was severable from the Amended Lease. The Court explained that because the only relief requested in the Motion to Extend was an extension of time under § 365(d)(4)(B)(i), that was the only issue that the Court was going to decide at that hearing.

Following arguments at the hearing, the Court ruled that the Motion to Extend was untimely. Under § 365(d)(4)(A)(i), a Chapter 7 trustee has 120 days from the date of the order for relief to assume or reject an unexpired lease of nonresidential real

property. Under § 365(d)(4)(B)(i), a "court may extend" the time for a Chapter 7 trustee to assume or reject an unexpired lease for nonresidential real property beyond 120 days from the order for relief, but only if the court does so "prior to the expiration of the 120-day period." Here, because the date of the order for relief was August 6, 2019, the 120-day period expired on December 4, 2019, a little over two weeks before the hearing on December 20, 2019. As a result, the Court found that it no longer had authority under § 365(d)(4)(B)(i) to extend the time for the Trustee to assume or reject the Amended Lease. The Court denied the Motion to Extend and expressed no opinion about the Trustee's request in this adversary proceeding for an adjudication that the Option was severable from the Amended Lease.

The Trustee's complaint ("Complaint") in this adversary proceeding has three counts. Count I, titled "Breach of Contract," seeks a money judgment against Dunivin for repudiating the Option. Count II, titled "Declaratory Judgment," seeks a declaration that the Trustee is entitled to purchase the Property under the Option. Count III, titled "Specific Performance of the Option," seeks a judgment compelling Dunivin to perform his obligations under the Option.

On March 17, 2020, Dunivin filed a motion for summary judgment ("Motion"). The Motion makes two basic arguments. First, because the Amended Lease was rejected, the Trustee cannot "invoke any of its terms." In other words, the entire Amended Lease has been rejected, and the Trustee may not "pick and choose" those

- 7 -

terms of the Amended Lease that are favorable to the Trustee and that the Trustee would still like to enforce. Because the Trustee breached the Amended Lease by rejecting it, the Trustee cannot now force Dunivin to perform any of its terms. Second, the Option is not severable from the Amended Lease because the Option is part of the Amended Lease, the only consideration for the Amended Lease was the rent, the Debtor did not pay any separate consideration for the Option, and the Amended Lease does not have a severability clause.

The Trustee concedes that the Amended Lease has been rejected but argues that he may still exercise the Option despite that fact. In support, the Trustee notes that the Option does not specify that it may only be exercised if the Amended Lease is not in default, and therefore the Option must survive rejection of the Amended Lease. Further, according to the Trustee, both the Debtor and Dunivin intended the Option to be severable, and there was separate consideration for the Option apart from the rent, consisting of Senk's agreement to continue managing the Debtor and the Debtor's agreement to hold Dunivin harmless from any personal guaranties in the event of a sale of the Property.

The Court heard the Motion on April 23, 2020 and took it under advisement. The Motion is now ready for decision.

- 8 -

## Summary Judgment Standard

Fed. R. Civ. P. 56 for summary judgment is incorporated into Fed. R. Bankr. P. 7056. Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48. A "genuine" issue is present "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Berryman v. Rieger, 150 F.3d 561, 566 (6th Cir. 1998) (quoting Anderson, 477 U.S. at 248).

"The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." Kalamazoo River Study Group v. Rockwell International Corp., 171 F.3d 1065, 1068 (6th Cir. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). "The burden then shifts to the non-moving party to come forward with specific facts, supported by evidence in the record, upon which a reasonable jury could return a verdict for the non-moving party." Id. (citing Anderson, 477 U.S. at 248). "The non-moving party, however, must provide more than mere allegations or denials . . . without giving any significant probative

- 9 -

evidence to support" its position.  <u>Berryman v. Rieger</u>, 150 F.3d at 566 (citing <u>Anderson</u>, 447 U.S. at 256).

## **Discussion**

Before considering how Dunivin's Motion addresses and applies to each of the three counts in the Complaint, the Court will first address the two principal legal issues briefed and argued by Dunivin and the Trustee — the effect of rejection of the Amended Lease, and whether the Option is severable from the Amended Lease.

### The effect of rejection of the Amended Lease

Because the 120-day period after the order for relief expired without assumption of the Amended Lease by the Trustee, the Amended Lease was "deemed rejected" under § 365(d)(4)(A).  Under § 365(g), "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease."

Recently, the Supreme Court in <u>Mission Product Holdings, Inc. v. Tempnology, LLC</u>, __ U.S. __, 139 S. Ct. 1652 (2019), addressed a long-standing dispute over whether the term "breach" in § 365(g) means the same thing as rescission.  The Supreme Court held that it does not.  <u>Id.</u> at 1661.  Although <u>Tempnology</u> involved a rejected contract rather than a rejected lease, the text of § 365(g) expressly applies both to rejection of a contract and to rejection of a lease.  The Court knows of no reason why <u>Tempnology</u> should not apply equally to a rejected lease as it does to a rejected contract.  In neither case does a breach constitute rescission.  But that still leaves open

- 10 -

precisely what the term breach, as used in § 365(g), means. The Supreme Court addressed that issue too: "'[B]reach' is neither a defined nor a specialized bankruptcy term. It means in the Code what it means in contract law outside bankruptcy." Id. To understand "the effects of rejection," the Supreme Court directed that the "first place to go . . . is non-bankruptcy contract law." Id. at 1662.

To understand the effect of the Trustee's breach of the Amended Lease requires the Court to first determine what non-bankruptcy contract law applies. The Amended Lease does not have a section that specifies what law applies. However, there is no dispute that the Property is located in Michigan, the Debtor is a Michigan corporation, Dunivin is a Michigan resident, and the Amended Lease was entered into in Michigan. In these circumstances, Michigan law applies to determine the effect of the Trustee's breach. See Keehn v. Charles J. Rogers, Inc., 18 N.W.2d 877, 880 (Mich. 1945) (citation omitted) (stating the general rule in Michigan "that contractual rights are governed by the law of the State in which the contract is made").

"Under Michigan law, '[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform.'" Pittman v. Experian Information Solutions, Inc., 901 F.3d 619, 639 (6th Cir. 2018) (quoting Ehlinger v. Bodi Lake Lumber Co., 36 N.W.2d 311, 316 (Mich. 1949)). See also Michigan Habilitation & Learning Center, Inc. v. Community Living Services, Inc., 2018 WL 3551583, at *2 (Mich. Ct. App. July 24, 2018)

- 11 -

("[W]hen the noncomplying performance amounts to a substantial or material breach of the contract, the breaching party is precluded from maintaining a claim for breach of contract based on the nonbreaching party's subsequent failure to perform.") (citing Baith v. Knapp-Stiles, Inc., 156 N.W.2d 575 (Mich. 1968)).

The Trustee does not dispute that he is in breach of the Amended Lease — both by the non-payment of rent and by the rejection. Nor does the Trustee argue that either of those breaches is somehow insubstantial or immaterial. But the Trustee alleges in count I of the Complaint that Dunivin breached the Amended Lease too. The problem for the Trustee is that Dunivin's alleged breach occurred *after* the Debtor and the Trustee had already breached. The Debtor breached when it failed to pay rent in June, 2019. The Trustee breached by rejection. Under § 365(g)(1), the Trustee's rejection constitutes a breach of the Amended Lease "immediately before the date of filing the petition." Count I of the Complaint alleges that Dunivin's breach occurred after the Debtor filed its Chapter 7 petition when the Trustee demanded that Dunivin "acknowledge the validity of the Option." By then, the Debtor and the Trustee had both substantially and materially breached the Amended Lease — the Debtor by failing to pay rent and the Trustee by rejecting the Amended Lease. Even assuming, arguendo, that Dunivin breached the Amended Lease, he was not the first party to breach the Amended Lease. That was indisputably the Trustee, now standing in the Debtor's shoes. As a result, under Michigan law, the Trustee may not seek to enforce the

- 12 -

Amended Lease, including the Option — unless the Trustee can demonstrate that the Option is severable from the Amended Lease.

## The Option is not severable from the Amended Lease

Under § 365, a contract or lease must be assumed or rejected in its entirety. City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1226 (6th Cir. 1995) (holding that "[w]hen the debtor assumes the lease or contract under § 365, it must assume both the benefits and the burdens of the contract," and cannot cherry pick what provisions are rejected). However, bankruptcy courts have recognized that sometimes a single document may contain more than one agreement. In those circumstances, bankruptcy courts have allowed an agreement that is severable from the remainder of a contract or lease to be assumed or rejected without assuming or rejecting all other agreements contained within the same document. See In re Holly's, Inc., 140 B.R. 643, 681 (Bankr. W.D. Mich. 1992) ("A single writing may contain more than one contract for § 365 assumption-rejection purposes.") (citing Byrd v. Gardinier, Inc. (In re Gardinier, Inc.), 831 F.2d 974, 975-76 (11th Cir. 1987)); In re Cutters, Inc., 104 B.R. 886, 889 (Bankr. M.D. Tenn. 1989) ("[I]f a document purports to contain a single contract but in reality contains separate severable agreements, then the debtor may reject a severable executory agreement."). As those courts note, the Bankruptcy Code does not provide guidance for determining whether one agreement may be severed

- 13 -

from other agreements contained in a single document.  That is left to non-bankruptcy law, in this case, Michigan law.

In Michigan, "'[a]s a general rule, a contract is entire when, by its terms, nature and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and is severable when, in its nature and purpose, it is susceptible of division and apportionment.'"  Dumas v. Auto Club Ins. Ass'n, 473 N.W.2d 652, 659 (Mich. 1991) (quoting City of Lansing v. Lansing Twp., 97 N.W.2d 804 (Mich. 1959)).

> In determining whether the terms of a contract are severable, courts look to the intention of the parties.  Two principal factors are considered: first, whether the two or more promises or parts of the contract are so interdependent or interwoven that the parties must be deemed to have contracted only with a view to the performance of both, and would not have entered into one without the other; and second, whether the consideration for the several promises can be apportioned among them without doing violence to the contract or making a new contract for the parties.  However, even though the consideration for each agreement is distinct, if the agreements are interdependent and the parties would not have entered into one in the absence of the other, the contract will be regarded as entire and not divisible.

Id. at 694 n.87 (Mich. 1991) (Levin, J., dissenting) (internal quotation marks, alterations and citations omitted).  See also Professional Rehabilitation Assocs. v. State Farm Mut. Auto. Ins. Co., 577 N.W.2d 909, 913 (Mich. Ct. App. 1998) ("The primary consideration in determining whether a contractual provision is severable is the intent of the parties.") (citation omitted).  "When the price is expressly apportioned by the

- 14 -

contract, or the apportionment may be implied by law, to each item to be performed, the contract will generally be held to be severable." Dumas v. Auto Club, 473 N.W.2d at 660 (quotation marks, emphasis and citation omitted). See also Stokes v. Millen Roofing Co., 649 N.W.2d 371, 374-75 (Mich. 2002) ("[T]he contract can be bifurcated only if the agreement to install the materials is independent of the agreement to supply them.").

Neither the original Lease nor the Lease Amendment contains a severability clause. The original Lease does not state that the parties intended the option contained in the original Lease to be separate or divisible from the original Lease. Nor does the Lease Amendment state that the parties intended the Option contained in the Lease Amendment to be separate or divisible from the Lease Amendment. There are only two only recitals in the Lease Amendment — one that recites that the Debtor and Dunivin are parties to the Lease and the other that recites that they "now desire to make certain amendments and modifications to the Lease." These recitals do not evidence any intention by the Debtor and Dunivin that the Option be severable from the Amended Lease.

Lacking a severability clause or other express statement of intent in the Amended Lease, the Trustee finds inferential support for his argument regarding the intention of the parties in other places in the Amended Lease. The Trustee points out that under the original Lease, the option to purchase the Property in the event of Dunivin's death

- 15 -

could only be exercised under section 22 if Dunivin died "when this Lease is in effect." In contrast, the four different options to purchase the Property under the Lease Amendment, including the Option in controversy here, do not have this qualification. The Trustee further notes that the Lease Amendment does not state that the Option may only be exercised if the Amended Lease is not in default. This is significant, the Trustee argues, because there is an express provision in section 21 of the original Lease that says that the Debtor may only exercise a right to renew the Lease at the end of its initial term if the Debtor "is not in material default" under the Lease at that time. In contrast, there is no provision in the Lease Amendment that says that the Debtor may only exercise the Option if the Debtor is not in material default under the Amended Lease at that time.

As additional evidence of the parties' intent, the Trustee relies on Senk's affidavit filed by the Trustee in opposition to the Motion. Senk does not directly state in her affidavit that the Debtor and Dunivin intended the Option to be separate and divisible from the Amended Lease. For the most part, Senk's affidavit parrots the Trustee's references to specific sections of the Amended Lease that inferentially support the Trustee's argument for severability. However, Senk does make additional statements in her affidavit regarding *her understandings* in entering the Lease Amendment. In paragraph 10, Senk explains that the "purpose" of the Lease Amendment was to expand the Debtor's option to purchase the Property and to provide

- 16 -

the Debtor with a right of refusal in the event of a sale of the Property.  In paragraph 12, Senk states that the "reason" for the reduced purchase price under the Option if Dunivin's employment with the Debtor was involuntarily terminated, was to give Dunivin an incentive to comply with his conduct requirements under the Shareholder Amendment.  In paragraph 13, Senk states that the "purpose" of the Memorandum was to protect the Debtor's interest in the Property by providing notice of the Debtor's options and right of first refusal for the Property.  Finally, in paragraph 17.f., Senk explains that the Option was "intended" to protect and compensate the Debtor by allowing the Debtor to continue its operations even if Dunivin's employment was terminated.

The Trustee argues that the parties' intention that the Option be divisible is further shown by the separate consideration that Dunivin received for the Option when the Lease Amendment was made.  The Trustee does not argue that this separate consideration was in the form of a payment to Dunivin for the Option, but instead consisted of the Debtor's promise in section 22.7 of the Lease Amendment to indemnify and hold Dunivin harmless from liability on any personal guarantee of a Debtor's obligation that remains unpaid upon a sale of the Property.  As further consideration, the Trustee points to Senk's willingness to continue to manage the Debtor, as evidenced by the Shareholder Amendment.

The Trustee does a good job at pulling at threads in the Amended Lease to try to make his case that the Debtor and Dunivin intended the Option to be severable. But the Court is not persuaded that the provisions of the Amended Lease cited by the Trustee show that this is what the parties intended. Stating the obvious, none of the provisions identified by the Trustee explicitly say what the Trustee wants them to say — that the Option may be severed from the Amended Lease. Nor do they implicitly say that either. It is undisputed that the Debtor's main location for its business was at the Property. There is nothing in the Lease Amendment that even remotely suggests that the Debtor would have requested or that Dunivin would have granted the Option absent the Debtor's continued operation of its business at the Property under the Amended Lease.

Senk's affidavit doesn't help either. First, Senk's statements in the affidavit are not admissible to the extent that they vary or contradict the Lease Amendment because section 7 of the Lease Amendment is an integration clause. See NAG Enterprises, Inc. v. All State Industries, Inc., 285 N.W.2d 770, 771 (Mich. 1979) (no evidence may "be admitted for the purpose of varying or contradicting the writing" when the writing contains an integration clause) (internal quotation marks and citation omitted). Second, and more important, accepting all of Senk's statements as true, those statements do not create any genuine issue of fact whether the parties intended the Option to be severable. Senk does not dispute that the Amended Lease does not state

- 18 -

that the parties intended it to be severable, nor does she state that the parties agreed it would be severable, or that they ever even discussed the question of whether it would be severable. Senk's affidavit does not state that the Debtor and Dunivin would still have entered the Option even if the Debtor did not rent the Property under the Amended Lease. If anything, Senk's affidavit makes clear that the sole reason for the Option was to enable the Debtor to continue to operate its business at the Property that it leased from Dunivin, and that the Option and Amended Lease are entirely interdependent on one another.

The Trustee's assertion that there was separate consideration for the Option apart from the rent that the Debtor paid under the Amended Lease in exchange for continuing to occupy the Property is just not supported by the record. The only payment that the Debtor was obligated to make to Dunivin, whether under the original Lease or the Lease Amendment, was monthly rent of $4,000.00. The Lease Amendment did not apportion any of the rent to the cost for the Option. The Debtor did not pay anything for the Option, nor did the Lease Amendment require the Debtor to pay anything for the Option.

The Trustee's contention that there was additional, non-monetary consideration for the Option fails too. There is nothing in the Lease Amendment to connect the section 22.7 hold harmless agreement in any way to the Option. And there is nothing in the Lease Amendment that required Senk to continue to manage the Debtor's

- 19 -

business, let alone to show that Senk had agreed to do so in exchange for the Option in the Lease Amendment.

The Trustee does identify one feature of the Lease Amendment that arguably cuts the Trustee's way: the Lease Amendment does not state that the Debtor must not be in default under the Amended Lease to exercise the Option. The Court agrees that the absence of a good standing clause in the Amended Lease is not inconsistent with the notion that the Option is severable. But that is not the same thing as saying that the absence of a good standing clause shows that the parties must have intended the Option to be severable. Everything else in the record points the opposite way. The absence of a severability clause, the absence of any evidence to show that the Option would have been requested or granted if the Debtor did not operate its business at the Property, the absence of any separate payment or other consideration for the Option, all show that the parties did not intend that the Amended Lease and the Option be severable. The terms of the original Lease and the Lease Amendment show that the purpose of the Option was to permit the Debtor to operate its business at the Property if Dunivin's employment with the Debtor was terminated, and that the Option would not have been granted without the Amended Lease. There simply is not enough evidence to create a genuine issue of fact that the Debtor and Dunivin intended the Option to be severable. Under Michigan law, the Option is a part of the Amended Lease, and is not severable from it.

- 20 -

## The three counts in the Complaint

The Motion does not specifically address each of the three counts of the Complaint. Nor does the Trustee's response. Both Dunivin and the Trustee focus their arguments on the effect of rejection of the Amended Lease and the question of severability. That makes sense because all three counts of the Complaint turn on those two legal issues.

Count I alleges breach of contract by Dunivin. The contract of course is the Amended Lease. According to the Complaint, Dunivin breached the Amended Lease by four separate acts: Dunivin "informed the Trustee" that the Lease Amendment was executed by him "under duress" (paragraph 24); Dunivin "informed the Trustee's attorney" that the Option was "invalid" for lack of consideration (paragraph 25); Dunivin "failed or refused to acknowledge the validity of the Option" (paragraph 28); and Dunivin "failed to provide adequate assurance of his future performance" of the Option (paragraph 30). The Complaint does not cite any provision in either the original Lease or the Lease Amendment that requires Dunivin to tell the Trustee anything about the Amended Lease or the Option, or prohibits Dunivin from taking a position contrary to the Trustee about the validity and enforceability of the Amended Lease or the Option. The Complaint points to no provision that requires Dunivin to agree with the Trustee's legal interpretation of these documents. In sum, the Complaint does not allege *how* any of these post-petition acts constitute a breach of the Amended Lease.

- 21 -

The entire count is premised on the Trustee having a right to exercise the Option. For the reasons explained earlier, the Trustee has no such right.

Count II seeks a declaratory judgment that the Trustee is entitled to purchase the Property and Dunivin is obligated to sell the Property under the Option. As explained earlier, because the Amended Lease has been rejected, and the Option is not severable from the Amended Lease, the Trustee does not have the right to purchase the Property and Dunivin is not obligated to sell the Property under the Option.

Count III seeks an order compelling specific performance of the Option by Dunivin. As with count II, because the Amended Lease is rejected, and the Option is not severable from it, the Trustee is not entitled to an order compelling specific performance.

There are no genuine issues of material fact in dispute and Dunivin is entitled to summary judgment as a matter of law on all three counts of the Complaint.

## Conclusion

The single largest asset in this Chapter 7 case was the Debtor's right to purchase the Property under the Option for 50% of fair market value. The Trustee understandably wanted to monetize this asset. But the Trustee was in a tough spot. This asset did not exist in a vacuum. It was part of a lease that the Debtor signed with Dunivin to operate the Debtor's business in a location owned by Dunivin. Under § 365 of the Bankruptcy Code, a Chapter 7 trustee is given only a short period of time to

investigate an unexpired lease of nonresidential real property and decide whether to assume or reject it.  Even where — as here — assumption may have value to the bankruptcy estate, a trustee may not have funds in the bankruptcy estate to perform under the lease if the trustee does assume it.  Here, if the Trustee wanted to exercise the Option, the Trustee had to do so before the Amended Lease was rejected.  The Trustee does not contend that he did so.  Through no fault of his own, the Trustee did not have sufficient funds in the bankruptcy estate to do so.  Now the Amended Lease, including the Option, is rejected, and the Trustee no longer has the right to purchase the Property under the Option.  Therefore, Dunivin is entitled to summary judgment on the Trustee's Complaint.[2]

---

[2]  Even if the Trustee had assumed the Amended Lease, the Option expired by its terms on April 14, 2020.  Under section 22.4 of the Lease Amendment, the Debtor could exercise the Option for 365 days after terminating Dunivin's employment for cause.  The Debtor issued the Termination Letter on February 14, 2019, effective February 15, 2019.  On February 14, 2020, the Trustee's attorney sent Dunivin a letter stating that the Trustee was exercising the Option.  Section 22.6 of the Lease Amendment states that the Debtor "shall pay the purchase price in cash at the closing, which shall occur within sixty days after the date" on which the Debtor exercises the Option.  Sixty days from February 14, 2020, the date the Trustee claims to have exercised the Option, is April 14, 2020.  The Trustee does not allege that he paid or tried to pay Dunivin the purchase price for the Property by that date.  All that the Trustee did after supposedly exercising the Option on February 14, 2020 was to have his attorney send Dunivin a letter on March 11, 2020 demanding that Dunivin provide "written confirmation" that he "will honor" the Option.  Even that letter acknowledges that the Trustee did not have the funds to pay for the Property and suggests only that the Trustee may file a motion with the Bankruptcy Court for authority to borrow the money to pay the Option price.  The Court file shows that the Trustee did not file that motion, and there is no evidence in the record to show that the Trustee tendered or tried to tender to Dunivin the purchase price for the Property at any time, and certainly not by April 14, 2020, the last date that the closing could take place under section 22.6 of the Lease Amendment.  The Amended Lease and Option were rejected, but even if they had not been rejected, the Option expired on April 14, 2020.

- 23 -

The Court will enter a separate order consistent with this opinion.

**Signed on May 20, 2020**



/s/ **Phillip J. Shefferly**

**Phillip J. Shefferly**
**United States Bankruptcy Judge**

- 24 -